FILED

07/10/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 14, 2017

## STATE OF TENNESSEE v. VIRGIL LUCAS BAKER

**Appeal from the Criminal Court for Davidson County**
**No. 2013-B-1033    Monte D. Watkins, Judge**

_____

**No. M2016-00974-CCA-R3-CD**

_____

A Davidson County Criminal Court Jury convicted the Appellant, Virgil Lucas Baker, of aggravated burglary, a Class C felony; vandalism of property valued more than $500 but less than $1,000, a Class E felony; and assault, a Class A misdemeanor. After a sentencing hearing, the trial court sentenced him to concurrent sentences of fifteen years; six years; and eleven months, twenty-nine days, respectively. On appeal, the Appellant contends that the trial court erred by denying his motion to suppress the victim's identifications of him and that the evidence is insufficient to support the convictions. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Emma Rae Tennent (on appeal) and Chaucey Fuller and Will Allensworth (at trial), Nashville, Tennessee, for the appellant, Virgil Lucas Baker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Nathan McGregor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

At trial, Cory Owen, the victim, testified that about 11:00 a.m. on Sunday, August 14, 2011, he and his eleven-year-old son were in the basement of their newly constructed home on Stone Hall Boulevard in Hermitage. The residential lots on either side of the

home were vacant, and the victim's wife was at work. The victim's car was in the garage, the garage door was down, and no other cars were in the driveway.

The victim testified that he heard "kind of like a slapping sound" on the main floor and went upstairs to investigate. As he got to the front door, he encountered the Appellant, who had come out of the master bedroom. The Appellant was wearing a t-shirt and shorts, and the victim had never seen him before that day. The Appellant hit the victim and knocked him down, and they "tussled." The victim said that he sustained numerous scratches and bruises and that his "only thought at that point was to get between [the Appellant] and his son."

The victim testified that the Appellant ran out the front door. The victim said he thought about his son and who else could be in the house, so he went into the master bedroom, took his loaded Glock pistol out of his nightstand, and pulled back the slide to make sure a round was in the chamber. He then went to find his son and see if anyone else was in the home. As he passed the front door, he saw the Appellant in the front yard and a car parked on the street. He said that the Appellant was "fumbling and looking like he was coming back in," so he shot at the car six to eight times to warn the Appellant to go away. Four or five bullets hit the car's back door, front door, and windshield, and the Appellant fled in the car. The victim described the car as a "four-door Honda Civic, kind of gray, silvery color."

The victim testified that he telephoned 911 and that he went to the emergency room "to get checked out." The front door to his home had been kicked in and "the casing on the side and the trim work [had been] taken off." Nothing in the house was missing, but a jewelry box in the master bedroom was open. A pillow from the bedroom was in the hallway just outside the bedroom, and a brown cotton glove was in the hallway between the living room and the front door. The victim said that he did not remember if the Appellant was wearing gloves or dropped anything but that the glove found in the hallway did not belong to anyone in his family. The next day, the victim paid "around $1,000" to replace the "whole interior" of the front door. He said he paid cash and did not receive a receipt. He identified photographs of his injuries, the damage to the front door, the glove and pillow, and a sliver Honda Accord with broken windows and bullet holes in the body.

The victim testified that Detective Craig Christie showed him a six-photograph array a couple of days after the break-in but that he was unable to identify anyone. He stated that the incident was "pretty devastating" and that he was still "shook up" when he looked at the array. On September 27, Detective Christie showed him another array, and he selected the Appellant's photograph. He explained,

- 2 -

I remember at that point taking more time, kind of looking at my hands or isolating each picture versus being overwhelmed by a line-up and me actually having to see a line-up. I just kind of took my time, uh, and was able to pick him out, so I guess it was more of kind of a hindsight type thing. It was very easy to identify him at that point.

. . . .

The [September 27] line-up I believe was a more recent picture which kind of made me realize okay, the first line-up was not, the general line-up did not look like him. I have seen the line-up now, the first and the [September 27] one and the first one, more facial hair, more hair on his head and it just did not seem like him the day that he broke in. The [September 27] line-up was a clearer picture, a more recent picture, and he looked more like the day that he had broken in.

. . . .

[W]hen he broke in he had a little bit of scruff, hair was very short. The first line-up that I saw was totally opposite. He had a lot of facial hair, a lot, uh, he had hair. The [September 27] more recent picture looked more like him in the face and the eyes is kind of what I was focusing on. He had shorter hair and the less, less facial hair.

Regarding the first array, the victim testified that he was "more rushed," "just kind of wanted to get out of the room," and did not take the time he should have to look at the photographs. The State asked if the victim was 100% certain about his identification of the Appellant in the September 27 array, and he said yes. At the conclusion of his testimony, he identified the Appellant in court as the intruder and said that "I know this is the guy that broke in my house."

On cross-examination, the victim testified that he selected a photograph from the first array but told Detective Christie that "[he] felt like [he] was just trying to pick somebody at random and [he] wasn't confident in that." He stated, "At that time frame, I thought it looked similar [to the intruder], but I wasn't positive." He acknowledged that he was "dazed" by the intruder's hitting him and that he and the intruder "were busy fighting." About six weeks later, on September 27, Detective Christie showed him

another six-photograph array, and he selected the Appellant's photograph. He acknowledged that the Appellant's "eyes and nose stood out" and that he was positive of his identification.

The victim testified that he never saw the Appellant with a weapon or a glove and that the police did not collect the pillow from the hallway. Items of value were in the jewelry box, but nothing was missing. He said he shot at the getaway car to scare the Appellant, not to injure or kill him, and that he did not remember telling 911 the car was a silver Pontiac. He said that based on the placement of the bullet damage in the silver Honda Accord in the photographs, he was sure it was the getaway car. He said that the man who repaired his front door was a "friend of a friend" but that the man was a licensed contractor who did "trim work" for a living.

On redirect examination, the State showed the first photograph array, with three black and white photographs on the top and three black and white photographs on the bottom, to the victim. The victim acknowledged that he selected the bottom left photograph, which was photograph number four. However, he told Detective Christie that "[he] was not confident at all." The Appellant's photograph was in the top right position in the first array and was photograph number three. The victim explained that the Appellant's photograph in the first array showed the Appellant with more hair on top of his head and more facial hair than was present on the day of the incident. The State then showed him the September 27 array, which also had three black and white photographs on the top and three black and white photographs on the bottom. The victim said he immediately selected the top right photograph, which was photograph number three, as the intruder. He acknowledged that the photograph was that of the Appellant and said that it looked more like the Appellant on the day of the break-in than photograph number three in the first array. He also acknowledged that photograph number one in the first array and photograph number two in the September 27 array were the exact same photographs of another man. However, he did not notice they were the same photographs when he looked at the array on September 27.

Heather Coakley testified that she was the Appellant's fiancé and that she did not want to testify against him. On August 14, 2011, Coakley and the Appellant were "separated," but she loaned her car to him. When the car was returned to her, bullet holes were in the body, the windows were broken, and glass was on the floorboards. Coakley's friends notified the police, and she spoke with an officer. The State showed Coakley photographs of a silver Honda Accord with broken windows and bullet holes, and she identified it as her Honda.

On cross-examination, Coakley acknowledged that she spent time with the Appellant on the morning of August 14. He woke her about 9:30 or 10:00 a.m. and asked

if she was going to sleep all day. The Appellant was acting normal and was not nervous. When Coakley saw her car later that day, it was damaged. The damage to the windshield was not caused by a bullet and appeared to have been caused by a blunt object. She stated, "And that is how the police report was written up was a hard metal object." Coakley said that she saw the Appellant a few days later and that he did not have any injuries.

Jennifer Shipman, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Laboratory, testified as an expert in DNA analysis that she received a brown, cloth glove and swabbed the inside of the glove for skin cells. She found skin cells containing DNA, compared the DNA to DNA from buccal swabs collected from the Appellant, and concluded that the DNA from the glove matched the Appellant's DNA. She stated that the DNA from the glove was a mixture of DNA from at least three individuals with the Appellant being the major contributor. She could not make any conclusions as to the minor contributors.

On cross-examination, Agent Shipman acknowledged that the Appellant's being the major contributor of the DNA did not mean he was the last person to touch the glove. She did not receive DNA samples for comparison from anyone other than the Appellant. At the conclusion of Agent Shipman's testimony, the State rested its case.

Detective Craig Christie of the Metropolitan Nashville Police Department (MNPD) testified that he went to the victim's home to investigate the burglary. He acknowledged that according to his first report of the incident, the victim described the getaway car as a "silver-gray two-door Honda Accord." Detective Christie also went to a home on Sarver Avenue in Madison, which was about ten miles from the victim's home, to look at a silver Honda Accord. Detective Christie spoke with Heather Coakley briefly on the telephone, and she told him that according to the time of the burglary reported on the news, the Appellant was at home with her.

Detective Christie testified that on August 16, 2011, he showed two photograph arrays to the victim. Detective Christie had the names of two suspects, the Appellant and a man with the last name "Moon," and each array contained a suspect's photograph. The victim was "shaken up" and "still upset from the incident" but did not say he could not look at the arrays. In the array that contained the Appellant's photograph, the victim selected another man's photograph. Detective Craig explained,

> When the line-up that contained Mr. Baker was presented to Mr. Owen to look at he looked through the photos kind of, I won't say quickly, but he looked through them and . . . . he kind of got fixated and I won't say he was upset, but he

- 5 -

> looked through them and he kind of felt like he was, I don't know if he felt like he was taking a quiz, but I told him to calm down and slow down and look and he felt like he said if I had to guess it would be and he pointed to a different person, not Mr. Baker and he said if I have to guess it would be this, but I can't say for certain of who or anybody in here, if he recognized anybody.

Detective Christie acknowledged that the victim told him that the victim did not "really get to look at the suspect's face." When Detective Christie showed the victim the array that contained Moon's photograph, the victim did not select anyone.

Detective Christie testified that he showed a third photograph array to the victim on September 27, 2011. The array contained an updated photograph of the Appellant that was taken one year after the photograph in the first array. The third array did not contain a photograph of Moon, and Detective Christie never showed an updated photograph of Moon to the victim.

On cross-examination, Detective Christie testified that he showed black and white arrays containing the Appellant's photographs to the victim. He explained that he used black and white arrays "so to not have any specific person stand out due to a background." Prior to the victim's viewing the first array on August 16, Detective Christie had the victim read a form titled "Advice to Witness Viewing Photographic Line-Up Display." Both Detective Christie and the victim then signed the form. When Detective Christie looked at the silver Honda at the home on Sarver Avenue, he noticed that the car had bullet holes in the body and broken glass inside. He knocked on the door of the home, but no one answered. The car was registered to Heather Coakley, and Detective Christie spoke with her on the telephone. He asked her to come to the police department to talk with him, but she never did.

On redirect examination, Detective Christie acknowledged that the Appellant's photograph was in position number three in the first and third arrays. Also, the same photograph of another man was inadvertently included in both arrays. Detective Christie never obtained a search warrant for Coakley's car.

Dr. Jeffrey Neuschatz testified as an expert in witness identification that he never met the victim but that he viewed the photograph arrays in this case. He said there were four "best practice guidelines for conducting a fair and unbiased line-up." First, the person conducting the line-up should not know the identity of the suspect in the lineup, and the person viewing the line-up should know that the person conducting the line-up did not know the suspect's identity. Second, the person viewing the line-up should be

instructed that the person who committed the crime may or may not be in the line-up. Third, the line-up should contain "fillers," people known to be innocent, and the fillers should match the description given by the witness so that no one unduly stood out. Finally, if the person viewing the line-up identified someone, the person conducting the lineup should get a "confidence statement" from the viewer, asking how confident the viewer was on a scale of one to ten that the viewer picked out the right person.

Dr. Neuschatz testified that the victim in this case viewed three line-ups and that Detective Christie failed to follow some of the guidelines. For example, Detective Christie "was not blind to the identity of the suspect in either line-up," and he used the same filler photograph in the first line-up that he used in the third line-up, which violated the rule that a person in the line-up should not stand out. Detective Christie also used the Appellant's photographs in the first and third line-ups. Dr. Neuschatz said that Detective Christie's using the Appellant's photographs in both line-ups jeopardized the victim's identification "a great deal" because "the image of a person in the [first] line-up, that image then gets encoded into memory." Thus, when the victim looked at the third line-up, "the person now stands out because [the viewer has] seen them twice." Using the same filler photograph twice also had the same effect. Detective Christie failed to obtain a confidence statement from the victim after either line-up, and he advised the victim only prior to the first line-up that the suspect may or may not be in the line-up. Dr. Neuschatz stated, "It should be done each time."

Defense counsel asked Dr. Neuschatz if the Appellant's photograph appearing in the same position in both line-ups affected the victim's identification. He answered, "I'm not sure. . . . In my expert opinion I would think that that would make the picture stand out even more." He said that memory was "fluid" and that "[i]t keeps changing over time as we collect more information." He stated that people could add or strip away information based on what they later learned about the event, that the information could be accurate or inaccurate, and that an event witnessed for a shorter duration was more susceptible to memory errors. Moreover, a person's being under stress at the time of the event would make it more difficult to make an accurate identification later. Dr. Neuschatz acknowledged that the victim's seeing the Appellant's photograph in the first array on August 16 could have changed the victim's memory so that the victim identified the Appellant in the third array on September 27.

Defense counsel asked Dr. Neuschatz to explain the relationship between a viewer's confidence in making an identification and the accuracy of the identification. Dr. Neuschatz stated,

> A lot of it depends on when people are asked how
> confident they are. If they are asked immediately then the

correlation is a little bit higher. It is still not very high, but it is a little higher, but [if] they are asked after any period of time from making the identification[,] the correlation is very very low and the reason the correlation is low between confidence and accuracy is because confidence can be pushed around by a lot of things that have nothing to do with people's memories . . . .

Defense counsel asked Dr. Neuschatz about the victim's 100% confidence level in this case. Dr. Neuschatz said, "It doesn't tell me a lot about the accuracy of the identification, especially given some of the other factors." Counsel then asked Dr. Neuschatz if the victim's identification of the Appellant was reliable. He answered, "I don't know. I can't say whether it is reliable or not."

On cross-examination, Dr. Neuschtz acknowledged that the victim and the intruder were both white; therefore, issues regarding cross-racial identification were not involved in this case. Furthermore, the intruder did not use a weapon, he did not wear a mask, the break-in occurred "in broad daylight," and the victim was in close proximity to the intruder during their struggle. Dr. Neuschtz stated that people "generally aren't stressed out during the line-up viewing." However, if the victim was stressed when he viewed the first line-up, then the stress would have made it more difficult for him to make an accurate decision.

Dr. Neuschtz testified that even though the photograph of the Appellant in the first line-up was different than the photograph of the Appellant in the third line-up, the first photograph could have "pollute[d]" the subsequent line-up. However, he acknowledged that including the same filler photograph in both lineups lessened the harm of just including the Appellant's photographs in the line-ups. He also acknowledged that the victim picked the wrong photograph in the first line-up and that he would not characterize that identification as a positive identification.

Dr. Neuschtz acknowledged that according to a statement made by the victim and documented by Detective Christie, the victim said of his September 27 identification of the Appellant, "'That is him. That is the guy in my house.'" However, the victim did not give a numerical quantity for his confidence. Regarding the victim's identification of the Appellant in court, Dr. Neuschtz stated that he did not think in-court identifications had any value. He explained,

My expert opinion is that after you have identified the person in a line-up seeing him several times and he is sitting over there by himself with the defense is an incredibly suggestive

procedure and in my, in my expert opinion gives me very
little evidence whether that is accurate or not.

Dr. Neuschtz stated that he had testified in numerous criminal trials previously, always for the defense, and that he was being paid $150 per hour for his testimony and $75 per hour for his non-professional time in this case.

Based on the foregoing proof, the jury convicted the Appellant as charged of aggravated burglary, a Class C felony; vandalism of property valued more than $500 but less than $1,000, a Class E felony; and assault, a Class A misdemeanor. After a sentencing hearing, the trial court sentenced him to concurrent sentences of fifteen years; six years; and eleven months, twenty-nine days, respectively, and ordered that the sentences be served consecutively to a previously-imposed sentence.

## II. Analysis

### A. Identifications

The Appellant contends that the trial court erred by denying his motion to suppress the victim's pretrial and in-court identifications of him. Specifically, he contends that the identification procedure was unduly suggestive and that the totality of the circumstances failed to establish the identifications were reliable because the first array and the September 27 array both contained his photograph, featured his photograph in the same position, and included the same filler photograph. In support of his argument, he notes that Dr. Neuschatz testified that those circumstances "greatly jeopardized" the victim's September 27 identification and that the victim identified someone else in the first array, which was conducted just two days after the break-in, but identified him in the September 27 array, which was conducted six weeks after the break-in. The State claims that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the Appellant filed a motion to suppress the victim's identification of him in the September 27 photograph array and the victim's in-court identification of him at the preliminary hearing on the basis that the identification procedure was unduly suggestive. During the suppression hearing, Detective Christie testified for the State that he spoke with the victim on the morning of August 14, 2011. Based on Crime Stoppers "tips" and "phone calls to the station," Detective Christie developed the Appellant as a suspect and showed a photograph array that contained his photograph to the victim. In the photograph, the Appellant had a goatee. Therefore, the other photographs in the array also showed men with goatees. The victim "made a comment that . . . the hair was different" and did not select the Appellant's photograph but selected another photograph. About one month later, Detective Christie obtained an updated photograph of the

Appellant, showing him without a goatee. The officer created another photograph array showing men, including the Appellant, with no facial hair. Detective Christie showed it to the victim, and the victim identified the Appellant as the intruder. Regarding the identification, Detective Christie stated as follows:

> Well, the [subsequent] line-up he took more time. I created the line-up and presented it to him at the station and he went through it a lot slower, used like a paper in his hands and he kind of took each one slower and when he got to Mr. Baker's picture, he put his finger on it, Mr. Virgil Baker, I'm sorry, put his finger on it and said that was the guy that was, something to the effect of that was the guy that was in my house. I don't remember the exact details, but he was pointing and saying "that was the guy in my house".

Detective Christie considered the victim's identification of the Appellant to be a positive identification. Later, DNA testing on the brown glove found in the victim's home matched the Appellant's DNA.

On cross-examination, Detective Christie acknowledged that it was "uncommon" to show a witness a subsequent array that contained a different photograph of the same suspect. However, Detective Christie did so in this case because he was able to obtain an updated photograph of the Appellant. Moreover, the Appellant's appearance in the two photographs was different, and the victim was unsure about his identification in the first array. Detective Christie said that "if [the victim] would have said that is the guy who was in my house and pointed to the wrong person [in the first array], then absolutely we would not go back with another photo."

Detective Christie acknowledged that he also developed a second suspect, Moon, early in the investigation. He said that he learned about Moon from the victim and that Moon was a plumber who worked in the victim's neighborhood. Detective Christie created an array containing Moon's photograph and showed it to the victim, but the victim did not identify Moon.

The victim testified that on the morning of the break-in, he heard a "crash" upstairs, went upstairs to see what had fallen, and met the Appellant in the foyer near the bedroom. The Appellant hit the victim in the face, knocking him down, and they struggled "for what seemed like an eternity." The victim pushed the Appellant out of the house, grabbed his pistol, and went out the front door. He said that the Appellant was still there and that he felt threatened, so he shot at the Appellant's car. The Appellant sped away. The Appellant was not wearing a mask, and the State asked if the victim got

a chance to look at the Appellant's face during their struggle. The victim answered yes and that "it has become more clear as time has passed, the fear itself has kind of gone away, but as far as remembering facial features and that kind of thing, yes."

The victim testified that two or three days later, Detective Christie showed him a photograph array. The victim said that he was "very distraught" at the time because his wife was nine months pregnant when the break-in occurred. He acknowledged that he selected a photograph that was not the Appellant's photograph but said, "I was not in the right sound mind or body to identify anybody and the individual that I did identify I wasn't sure. I said if I had to guess. It wasn't making a positive identification by any means."

The victim testified that he later viewed another array. He stated,

> The [subsequent] line-up was after several days of regaining my life and getting back to normal and it was a more updated picture if I recall correctly, the first picture he had more hair on top of his head and more facial hair and the [subsequent] picture was more of an updated, more realistic picture, and I was able to identify him at that point.

The victim said he did not see a photograph of the Appellant during the time period between the two line-ups, such as on the television news. He said that he never told the police about Moon but told them that "maybe we should be looking at somebody in the neighborhood." He stated that "Mr. Moon did not come from me" and that "I have no idea who that is." At the conclusion of his testimony, the victim identified the Appellant in court as the person who entered his home. He said he was "100 percent confident."

On cross-examination, the victim testified that he thought the Appellant was wearing blue-jean shorts and a t-shirt at the time of the break-in. Defense counsel asked if the intruder had facial hair, and the victim answered, "There was scruff, I don't recall, full beard, full goatee, but it was scruff, yeah." The victim and the Appellant fought for forty-five seconds to one minute, they "[c]ouldn't get much closer," and the victim "absolutely" had an opportunity to see the Appellant's face. The victim said that he did not hit his head during the struggle, that he was able to see clearly, and that he did not wear glasses or contact lenses.

Regarding the first photograph array, the victim testified that Detective Christie "put [him] in a room," "kind of went over the rules" with him, and told him to see if anyone in the line-up was in his house. The array consisted of six photographs, and the victim looked at all of the photographs for a total of twenty to thirty seconds. A month

later, Detective Christie showed him another array. The victim said he "basically took [his] time," isolated each photograph, and did not rush like he did the first time. He said he looked at each photograph for twenty to thirty seconds and looked at all of the photographs even though he recognized the Appellant as soon as he saw the Appellant's photograph. He said that in identifying the Appellant, "the nose and around the eyes was what I was really concentrating on."

In a written order, the trial court relied on Neil v. Biggers, 409 U.S. 188 (1972), and found that the September 27 array was not unduly suggestive. The court then stated that "[t]he alleged victim had an opportunity to observe the defendant; had an up close observation with the defendant during an altercation between the two; did not pick the defendant in the initial lineup; however made the photo lineup identification within approximately one month of the altercation." Accordingly, the court denied the Appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Biggers, the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. 409 U.S. at 198-99. First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99. The Supreme Court identified five factors for determining the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior

description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. 409 U.S. at 199-200; see also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). If, using the Biggers standard, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

Regarding the Appellant's claim that the use of his photograph in both arrays and in the same position tainted the identifications, the United States Supreme Court has stated that the "danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." Simmons v. United States, 390 U.S. 377, 383 (1968). That said, we have looked at both arrays and both photographs of the Appellant closely. The photograph of the Appellant in the first array looks completely different from photograph of the Appellant in the September 27 array. Indeed, the difference is so striking, that we would not have known both photographs were of the Appellant if that fact not been revealed at the suppression hearing or at trial. Therefore, we agree with the trial court that the use of the photographs was not unduly suggestive.

Furthermore, the victim in this case testified that he "absolutely" had an opportunity to view the Appellant as they were struggling and that he viewed the Appellant again in the front yard; that the September 27 photograph of the Appellant, showing the Appellant with less hair on top of his head and less facial hair, more closely resembled the Appellant on the day of the break-in than the previous photograph; and that he was one hundred percent certain of his identification. In addition, the victim's positive identification of the Appellant occurred just six weeks after the crimes. See State v. Edwards, 868 S.W.2d 682, 695 (Tenn. 2000) (noting that in Forbes v. State, 559 S.W.2d 318 (Tenn. 1977), our supreme court held that a span of ninety-eight days was within close proximity and, therefore, favored admissibility). Therefore, we also agree with the trial court that the identification procedure was not unreliable under the Biggers factors.

As to the Appellant's claim that the use of the same filler photograph in both arrays caused the second array to be unduly suggestive, the Appellant did not make this argument at the suppression hearing or in his motion for new trial, and the trial court did not address it in the order denying the motion to suppress. See Tenn. R. App. P. 36(a). In any event, other evidence linked the Appellant to the crimes, and even the Appellant's own expert testified that while using the same filler photograph was suggestive, he could not say the victim's identification of the Appellant was unreliable. See Tenn. R. App. P.

36(b).  Accordingly, we conclude that the trial court properly denied the motion to suppress.

## B.  Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because the State failed to prove beyond a reasonable doubt that he was the intruder.  He argues that his fiancé testified he was with her during the timeframe of the burglary, that there were no eyewitnesses to the crime other than victim, that the DNA found inside the glove contained a mixture of DNA, and that the victim was unable to say the intruder was wearing gloves.  He also claims that the evidence is insufficient to support his felony vandalism conviction because the State failed to prove the value of the damage to the door.  The Appellant notes that he was arrested for misdemeanor vandalism but later indicted for felony vandalism even though "all relevant facts regarding the cost of the repair were known to both [the victim] and [Detective] Christie when the original warrant was secured."  The State argues that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the

same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated burglary occurs when a person enters a habitation and commits or attempts to commit a theft. Tenn. Code Ann. §§ 39-14-403(a); -402(a)(3). A person commits vandalism when the person knowingly causes damage to or the destruction of any real or personal property and knows that the person does not have the owner's effective consent. Tenn. Code Ann. § 39-14-408(a). Misdemeanor assault occurs when a person intentionally, knowingly, or recklessly causes bodily injury to another. Tenn. Code Ann. § 39-13-101(a)(1). "Bodily injury" includes abrasions and bruises. Tenn. Code Ann. § 39-11-106(a)(2).

Taken in the light most favorable to the State, the evidence shows that a man kicked open the victim's front door, ripping off the casing and trim work; struggled with the victim, causing bruises and scratches; and fled out the front door. The victim said he retrieved a pistol from his bedroom and shot at the man's silver Honda, striking it multiple times. A glove left in the home by the intruder contained the Appellant's DNA, and police later found a damaged silver Honda Accord at the home of Heather Coakley, the Appellant's fiancé. The damage included bullet holes in the body and shattered windows, and the victim identified the Honda as the getaway car. He also identified the Appellant as the person in his home. Coakely testified that the Appellant woke her about 9:30 or 10:00 a.m. on the day of the burglary; however, the burglary occurred just ten miles away about 11:00 a.m. Thus, the evidence is more than sufficient to support the convictions.

Regarding the value of the damage to the door, vandalism is a Class E felony if the value of the property is more than $500 but less than $1,000. Tenn. Code Ann. § 39-14-105(a)(2). "Acts of vandalism are to be valued according to the provisions of § 39-11-106(a)(36)." Tenn. Code Ann. § 39-14-408(c). Tennessee Code Annotated section 39-11-106(a)(36)(A) defines "value" as

> (i) The fair market value of the property or service at the time and place of the offense; or

> (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense.

"If property . . . has value that cannot be ascertained by the aforementioned criteria, . . . the property . . . is deemed to have a value of less than fifty dollars ($50.00)." Tenn.

Code Ann. § 39-11-106(a)(36)(C). Generally, "[a] witness may testify to the value of the witness's own property or services." Tenn. R. Evid. 701(b). It is the jury's prerogative to determine the fair market value of the items. State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981).

In describing the repairs to the door, the victim testified that "[t]here were parts of the door that had to be replaced that the hinge and the bolt and everything was bent beyond repair, the door facing, the [jamb], whatever those technical terms are, but the whole interior of the door had to be replaced." Photographs of the wood door confirm damage to the jamb, casing, and trim. The victim said that the day after the crimes, he paid a licensed contractor $1,000 cash to repair the door, that he worked as a banker and could afford to do so, and that he did not receive a receipt. We conclude that the evidence is sufficient to sustain the Appellant's conviction for vandalism over $500.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 16 -